# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT CINCINNATI

Jahmir Christopher Frank,

      Plaintiff,

    vs.                               Case No. 1:18-cv-00618

The Good Samaritan Hospital of Cincinnati,      Judge Michael R Barrett
Ohio,

      Defendant.

## OPINION AND ORDER

This matter is before the Court on two separate but related motions: Defendant's Motion to Strike Dr. Jennifer Jones Hollings and Dr. Michael Katz as Plaintiff's Expert Witnesses (Docs. 87, 92, 96) and Defendant's Motion for Summary Judgment (Docs. 88, 93, 95).

## I.    BACKGROUND

With some additions, the Court reprints below the background narrative that appeared in its Opinion and Order issued on August 16, 2021. (*See* Doc. 105 PAGEID 1848–51).

**Allegations within the Complaint.** Plaintiff Jahmir Christopher Frank was born at Defendant Good Samaritan Hospital on July 30, 1998. (Doc. 1 PAGEID 2 (¶ 1)). Plaintiff suffers from periventricular leukomalacia ("PVL"), a permanent and debilitating brain injury that he attributes to trauma in utero during his delivery. (*Id.* at PAGEID 2 (¶ 2), PAGEID 7 (¶¶ 23–26)). His "Medical Malpractice Complaint with Class Allegations for Negligent Destruction of Medical Records" set forth three causes of action: medical malpractice, respondeat superior, and negligence, specifically the negligent destruction of medical records. (*Id.*).[1]

---

[1] Plaintiff originally filed suit in the Court of Common Pleas for Hamilton County, Ohio on August 12, 2016, suing the Hospital for medical malpractice. (*See* Doc. 17-3). Upon learning that his birth records were

**Motion practice to date.** This Court granted the Hospital's motion to dismiss Plaintiff's negligence cause of action on December 9, 2019. (Doc. 52). And because Plaintiff's class action allegations were supported solely by the dismissed negligence cause of action, the undersigned *sua sponte* denied Plaintiff's pending motion for class certification on December 17, 2019. (*See* Doc. 53).[2]

---

negligently destroyed by a third party—Cintas—he amended his complaint in state court to add an additional cause of action for "spoliation of evidence." (*See* Doc. 17-4). Specifically, Plaintiff alleged that, following his "improper delivery," the Hospital was "aware that litigation for medical malpractice was probable." (*Id.* PAGEID 172). He further alleged that his birth records were "lost or destroyed due to the willful acts of [the Hospital] in not assuring retention of these crucial documents despite actual knowledge that litigation was probable" and that the Hospital's failure to retain the records "was calculated to disrupt" his suit for medical malpractice. (*Id.* PAGEID 173 (¶¶ 32, 33)). The Hospital filed a motion for partial summary judgment with respect to this new cause of action, which the state court judge granted on May 16, 2018. (*See* Doc. 17-5). The court found that Plaintiff "failed to provide any evidence showing that: 1) Defendants had any knowledge of pending or probable litigation; 2) Defendants willfully destroyed documents; or 3) that there was willful destruction of evidence designed to disrupt Plaintiff's case." (*Id.*).

The Hospital represents that, on June 7, 2018, the state court judge ordered the remainder of Plaintiff's amended complaint be dismissed "[i]n light of Plaintiff's failure to identify an expert who would testify, or was qualified to testify, that anyone at the Defendant hospital breached any applicable standard of care during the labor and delivery of the Plaintiff[.]" (Doc. 17 PAGEID 141; *see* Doc. 42 PAGEID 783–84, Doc. 63 PAGEID 1067–68, Doc. 88 PAGEID 1657–58). But before the court journalized its ruling, the next day, June 8, 2018, Plaintiff filed a notice of voluntary dismissal without prejudice pursuant to Ohio Civ. R. 41(a). (*See* Doc. 17-7). Plaintiff's counsel confirms this sequence of events. (*See* Doc. 25 PAGEID 580 ("In the litigation in the Court of Common Pleas, Hamilton County, negotiations between Plaintiff and Defendants resulted in the creation of the Agreed Protective Order. In fact, in anticipation to engaging in the procedures set forth in the Agreed Protective Order, Defendants brought the disc to a hearing, preparing to turn it over to undersigned counsel. However, **at the hearing, Judge Jodi Luebbers** ("Judge Luebbers") **granted Defendants' Motion for Summary [J]udgment on the basis that no adequate affidavit of merit had been filed** (because Plaintiff had no delivery records and no fetal monitor strips). **Prior to the order being journalized, the undersigned counsel filed a Rule 41(a) notice of dismissal without prejudice.**") (emphases added)).

Invoking diversity jurisdiction, (*see* Doc. 1 PAGEID 5 (¶ 11)), Plaintiff filed suit in the Southern District of Ohio on August 31, 2018.

[2] At Plaintiff's request, the Court concomitantly directed entry of a final judgment as to his negligence cause of action pursuant to Fed. R. Civ. P. 54(b). (Doc. 52 PAGEID 933–35). Plaintiff's appeal was dismissed for want of prosecution by the Sixth Circuit Court of Appeals on January 24, 2020 (Doc. 59) and his motion to reinstate was later denied on February 27, 2020 (Doc. 62). Plaintiff's second motion to reinstate was granted on July 10, 2020. (Doc. 81). In a paragraph-long per curiam opinion, the Sixth Circuit affirmed the dismissal of Plaintiff's negligence cause of action on April 15, 2021. *Frank v. Good Samaritan Hospital of Cincinnati, LLC*, No. 19-4268 (6th Cir. Apr. 15, 2021) (Doc. 46-2) ("The district court dismissed Jahmir Frank's suit for negligent destruction of medical records after Frank failed to make any argument that Ohio recognizes such a tort. His brief before us is similarly 'devoid of any legal argument' in that regard. *Cooper v. Commercial Sav. Bank*, 591 F. App'x 505, 509 (6th Cir. 2015). The striking legal emptiness of his brief means that he abandoned the argument and forfeited his appeal. *Id.* Accordingly, we affirm.").

2

This Court also denied Plaintiff's motion for partial summary judgment (Doc. 61) against the Hospital on the issue of liability on April 8, 2020. (*See* Doc. 64). In support of his motion, Plaintiff offered the opinion testimony of Augustus G. Parker III, M.D., a practicing physician in the field of obstetrics and gynecology, who stated, "It is not possible to render a standard of care opinion without reviewing either the birth records of the delivery, fetal monitoring strips, or both." (Doc. 61-7, Parker Aff. PAGEID 1057 (¶ 1), 1058 (¶ 7)).[3] Because he played no role in the destruction of his medical records, and because his expert testified that a standard of care opinion could not be rendered without them, Plaintiff argued that he was entitled to judgment as a matter of law on the issue of liability. That is, Plaintiff asked the Court for judgment as a matter of law that the Hospital violated the applicable standard of care during his birth, causing his brain injury, leaving only damages to be decided by a jury. The Court concluded that this relief was inappropriate. A spoliation sanction was not warranted because Plaintiff failed to establish either that the Hospital had an obligation to preserve his medical records or a culpable state of mind. (Doc. 64 PAGEID 1115–21). And because Plaintiff offered no proof of intent, a sanction under Fed. R. Civ. P. 37(e) was not warranted either. (*Id.* PAGEID 1121–22).[4]

---

[3] An electronic copy of Plaintiff's fetal monitoring strips remains, but the data cannot be accessed because the technology is outdated. (*See* Doc. 61-5, Greenberg Aff. PAGEID 1054 (¶ 5); Doc. 61-6, Buxton Aff. at PAGEID 1057 (¶ 18)).

[4] Plaintiff was thereafter cautioned that—absent newly-discovered evidence—the Court would not again revisit the Hospital's "conduct in relation to the lost medical evidence." (*See* Doc. 66 PAGEID 1126–27). Still, despite the undersigned's three prior orders (Docs. 52, 53, 64) and an unsuccessful interlocutory appeal to the Sixth Circuit Court of Appeals (Docs. 56, 57, 59, 62, 81, 103, 104) resulting in sanctions against Plaintiff's counsel (*Frank v. Good Samaritan Hospital of Cincinnati, LLC*, No. 19-4268 (6th Cir. May 20, 2021) (Doc. 56-2), (6th Cir. May 28, 2021) (Doc. 61-2)), Plaintiff nonetheless reprised the issue by filing the September 23, 2020 "Affidavit of Dr. Augustus Garland Parker, III in Opposition to Defendant's Motion for Summary Judgment." (Docs. 92-2, 93-2). The Court has since granted Defendant's motion to strike this testimony. (*See* Doc. 105 PAGEID 1856 ("The Court will not consider Dr. Parker's September 23, 2020 affidavit when deciding Defendant's motion to strike Drs. Hollings and Katz as Plaintiff's expert witnesses or Defendant's summary judgment motion.") (footnote omitted)).

Remaining for resolution is Plaintiff's individual medical malpractice claim against the Hospital.

**Expert disclosures**. In compliance with the Court's April 17, 2020 Amended Calendar Order (Doc. 66), Plaintiff disclosed four experts on May 29, 2020: Jennifer Jones Hollings, M.D. (standard of care); Michael D. Katz, M.D. (causation); William T. Baldwin, Jr., Ph.D. (economist regarding damages); and Sharon Brown Lane, MRC, CRC, QRC (vocational rehabilitation consultant regarding employability). (*See* Doc. 76). Dr. Parker, whose testimony Plaintiff offered for the proposition that it was "not possible" to render a standard of care opinion, was not disclosed as an expert. On June 3, 2020, Plaintiff filed an updated report from Dr. Katz. (Doc. 77).

The Hospital disclosed three experts on August 19, 2020 and filed their affidavits in support of its pending summary judgment motion: Alan Bedrick, M.D. (causation) (Doc. 82-1); Elias Chalhub, M.D. (causation) (Doc. 83-1); and Harry Franklin Farb, M.D. (standard of care/causation) (Doc. 84-1).

As noted, the Hospital moves to strike Drs. Hollings and Katz as Plaintiff's expert witnesses.

## II.     LAW AND ANALYSIS

The Court will consider the Hospital's motion to strike first. *See Brainard v. Am. Skandia Life Assurance Corp.*, 432 F.3d 655, 667 (6th Cir. 2005) ("Generally, a district court should dispose of motions that affect the record on summary judgment before ruling on the parties' summary judgment motions."). "[S]uch an approach makes sense given that a court

cannot determine the scope of the materials properly before it without first ruling on any pending

evidentiary . . . motions."  *Id.*

### A. DEFENDANT'S MOTION TO STRIKE DR. JENNIFER JONES HOLLINGS AND DR. MICHAEL KATZ AS PLAINTIFF'S EXPERT WITNESSES

The Hospital argues that Dr. Hollings is not competent to provide an expert medical

opinion because she does not satisfy the "active clinical practice" requirement set forth in Ohio

Evid. R. 601(B)(5)(b).  The Hospital also argues that Fed. R. Evid. 702 and *Daubert v. Merrell*

*Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), preclude admission of her opinion because it is

unreliable.  Hence the Hospital moves to strike Dr. Hollings as an expert witness and, in turn, Dr.

Katz, because Dr. Katz bases his revised opinion on the opinion of Dr. Hollings.  The Hospital

additionally maintains that Dr. Katz is not qualified to testify under Rule 702 because both his

original and revised opinions are speculative.

Alternatively, the Hospital "seeks relief" under Fed. R. Civ. P. 56(c)(2), asking that

Plaintiff be prohibited from using Dr. Hollings's deposition testimony and the expert reports of

Drs. Hollings and Katz in response to its summary judgment motion.  (*See* Doc. 87 PAGEID

1639).

**Objections under Fed. R. Civ. P. 56(c)(2).**  Fed. R. Civ. P. 56(c)(2), as amended in

2010, governs the procedure by which courts must review objections to the admissibility of

evidence presented in connection with a motion for summary judgment.  *Smith v. Interim*

*HealthCare of Cincinnati*, Inc., No. 1:10-cv-582, 2011 WL 6012971, at *4 (S.D. Ohio Dec. 2,

2011).  A party moving for (or opposing) summary judgment may cite to materials in the record,

including depositions, documents, affidavits or declarations, and admissions.  Fed. R. Civ. P.

56(c)(1)(A).  If a party believes that the material cited to support (or dispute) a fact "cannot be

presented in a form that would be admissible in evidence[,]" that party may file an objection.

Fed. R. Civ. P. 56(c)(2).  Motions to strike, then, are no longer appropriate.  *Smith*, 2011 WL 6012971, at *4 ("The objection functions much as an objection at trial, adjusted for the pretrial setting.  The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated.  **There is no need to make a separate motion to strike.**") (emphasis added)) (citing Fed. R. Civ. P. 56 advisory committee's notes (2010 Amendment)); *see Erwin v. Village of Morrow*, No. 1:16-cv-1166, 2019 WL 1495921, at *1 (S.D. Ohio Apr. 4, 2019).  "If a party does file a separate motion to strike, the motion should be construed as an objection under Rule 56(c)(2)."  *Stillwagon v. City of Delaware*, 274 F. Supp. 714, 737 (S.D. Ohio 2017) (citing *Smith*, 2011 WL 6012971, at *4).  Accordingly, the Court will construe the Hospital's motion to strike as objections under Rule 56(c)(2).

     **Applicable standard**.  "In federal diversity actions, state law governs substantive issues and federal law governs procedural issues."  *Legg v. Chopra*, 286 F.3d 286, 289 (6th Cir. 2002) (citing *Erie R.R. Co. v. Tomkins*, 304 U.S. 64 (1938)).  But "some state evidentiary rules have substantive aspects, thereby defying the substance-procedure distinction and creating a potential *Erie* conflict."  *Id.* at 290 (citations omitted).  "State witness competency rules are often intimately intertwined with a state substantive rule."  *Id.*  "This is especially true with medical malpractice statutes, because expert testimony is usually required to establish the standard of care."  *Id.* (citation omitted).  The federal rule of evidence regarding witness competency avoids the conflict, however, by expressly incorporating the *Erie* mandate.  *Id.*  "[I]n a civil case, state law governs the witness's competency regarding a claim or defense for which state law supplies the rule of decision."  Fed. R. Evid. 601.

     While state law determines expert witness *competency* in medical malpractice cases, federal law determines whether a witness is *qualified* to testify as an expert. *Bock v. Univ. of*

*Tenn. Med. Group, Inc.*, 471 F. App'x 459, 461–62 (6th Cir. 2012) ("First, we consider witness competency—which 'is "intimately intertwined" with the [state] substantive law'—a substantive consideration under Rule 601.  Second, we consider the witness's qualification, a 'procedural' gatekeeping consideration under Rule 702 and *Daubert*.") (citing *Legg*, 286 F.3d at 291–92); *Reber v. Lab. Corp. of Am.*, No. 2:14-CV-2694, 2017 WL 3888351, at *7 (S.D. Ohio Sept. 6, 2017) (Marbley, J.) ("Witness competency is governed by state law, whereas expert qualification is governed by Federal Rule of Evidence 702 and *Daubert*.") (citing *Bock*, 471 F. App'x at 461–62).

**Competency under Ohio Evid. R. 601.**  Rule 601—titled "General Rule of Competency"—was revised on July 1, 2020 and most recently on July 1, 2021.  As currently configured and regarding expert testimony,[5] the rule provides:

> (B) **Disqualification of witness in general**.  A person is disqualified to testify as a witness when the court determines that the person is:
>
> . . . .
>
> (5) A person giving expert testimony on the issue of liability in any medical claim, as defined in R.C. 2305.113, asserted in any civil action against a physician, podiatrist, or hospital arising out of the diagnosis, care or treatment of any person by a physician or podiatrist, unless:
>
> > (a) The person testifying is licensed to practice medicine and surgery, osteopathic medicine and surgery, or podiatric medicine and surgery by the state medical board or by the licensing authority of any state;
> >
> > (b) **The person devotes at least one-half of his or her professional time to the active clinical practice in his or her field of licensure**, or to its instruction in an accredited school and

---

[5] Prior to the July 1, 2020 amendment, expert witness competency requirements were set forth in subdivision (D) of Ohio Evid. R. 601.  After the July 1, 2020 amendment, they appeared in subdivision (E).  After the most recent amendment on July 1, 2021, they appear in subdivision (B).  *See* https://www.supremecourt.ohio.gov/ruleamendments/documents/Online%20Posting%20-%20Final%20Rules%20(7.1.21).pdf ("Following the enactment of amended Evid.R. 601, it was discovered that the rule was organized in such a way as to be confusing.  This proposed amendment is intended to clarify and simplify the numbering and lettering of the rule's subsections.") (last visited 09/01/2021).

> (c) The person practices in the same or a substantially similar specialty as the defendant. The court shall not permit an expert in one medical specialty to testify against a health care provider in another medical specialty unless the expert shows both that the standards of care and practice in the two specialties are similar and that the expert has substantial familiarity between the specialties.

Ohio Evid. R. 601(B)(5) (text emphasis added). Rule 601 does not define "active clinical practice." This omission "leav[es] courts to struggle with this somewhat elusive requirement when evaluating the competency of medical experts." *Johnson v. Abdullah*, 2019-Ohio-4861, 136 N.E.3d 581, at ¶ 12 (Ohio App. 1st Dist. 2019), *appeal accepted for review*, 158 Ohio St. 3d 1511, 2020-Ohio-2815, 144 N.E.3d 462.[6]

The Ohio Supreme Court has held that "the phrase 'active clinical practice' includes more than those physicians who regularly treat patients directly[.]" *McCrory v. State*, 67 Ohio St. 2d 99, 104, 423 N.E.2d 156 (1981). It also includes physicians whose work "is so related or **adjunctive** to patient care as to be necessarily included in th[e] definition for the purpose of determining fault or liability in a medical claim." *Id*. (emphasis added). Put another way, the physician's professional activity must be "of the type that forms an **essential link** in the **chain of services** which comprise the **comprehensive treatment** of patients." *Goldstein v. Kean*, 100 Ohio App. 3d 255, 257, 461 N.E.2d 1350, 1353 (Ohio App. 10th Dist. 1983) (emphases added).

"A trial court has discretion to determine whether a witness is competent to testify as an expert[.]" *Celmer v. Rodgers*, 114 Ohio St. 3d 221, 225, 2007-Ohio-3697, 871 N.E.2d 557, ¶ 19 (2007).

---

[6] The case is fully briefed on the merits and oral argument was held on March 30, 2021. https://www.supremecourt.ohio.gov/Clerk/ecms/#/caseinfo/2020/0303 (last visited 09/01/2021).

**Qualification under Fed. R. Evid. 702.**  Rule 702—titled "Testimony by Expert Witness—provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods;
>
> (d) and the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 was amended in 2000 in response to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and to the many cases applying *Daubert*.  *See* Fed. R. Evid. 702 advisory committee's notes (2000 Amendment).

**Dr. Hollings is not competent to testify under Ohio Evid. R. 601(B)(5)(b).**   The purpose of Ohio Evid. R. 601(B)(5) is "to prohibit a physician who makes [her] living as a professional witness from testifying on the liability of physicians who devote their professional time to the treatment of patients."  *Celmer*, 871 N.E.2d 557, at ¶ 23 (citing *McCrory*, 67 Ohio St. 2d at 103–04); *Johnson*, 136 N.E.3d 581, at ¶ 1 ("Evid. R. 601[(B)(5)(b)] stems from a salutary purpose—preventing 'hired gun' professional witnesses who do not actually treat patients from pontificating on how treating doctors should have performed their jobs in medical malpractice cases.").

Jennifer Jones Hollings, M.D. graduated from the Howard University College of Medicine in 2002, finished her residency at the George Washington University School of Medicine and Health Sciences in 2006, and first became board-certified in obstetrics and

gynecology in 2007. (Doc. 86-1, Hollings Dep. PAGEID 1529–31 (7:1–9:2); Doc. 76-1,

Hollings Curriculum Vitae PAGEID 1389–90)). She is a general obstetrician/gynecologist

("OB/GYN") and has never practiced in the subspecialties of maternal-fetal medicine,

neonatology, or pediatric neurology. (Doc. 86-1, Hollings Dep. PAGEID 1532 (10:5–15)). She

has never diagnosed PVL. (*Id*. PAGEID 1532–33 (10:19–11:1)).

Dr. Hollings currently is employed as a Physician Clinical Reviewer for Magellan Health

Care ("Magellan"), where she has been working since October 2018. (*Id.* PAGEID 1533

(11:14–25), 1542 (20:10–19); Doc. 76-1, Hollings Curriculum Vitae PAGEID 1389). She has

also been employed as a Peer Reviewer/Quality Reviewer for Keystone Peer Review

Organization ("KEPRO") since October 2012. (Doc. 86-1, Hollings Dep. PAGEID 1546

(24:18–25:22); Doc.76-1, Hollings Curriculum Vitae PAGEID 1389). Neither Magellan nor

KEPRO provide direct medical services. (Doc. 86-1, Hollings Dep. PAGEID 1536 (14:11–14),

1548 (26:1–21)). In her role with Magellan, Dr. Hollings "make[s] sure that the examinations

that are ordered and provided to the patients are – make clinical sense." (*Id*. PAGEID 1538

(16:4–6)).

> Q. And what is the outcome of whether or not you decide that the tests or
> the procedure makes clinical sense?
>
> A. I review the medical records, and we make some opinions based on
> review of medical records alone. If there is a disagreement or a physician
> wants to discuss it further, then I speak with them directly, and we'll
> review it in real-time.
>
> Q. What's the outcome if you have concluded that the test is unnecessary?
>
> A. **Then the test could potentially still be ordered with the
> understanding that someone other than their insurance provider
> would be paying the cost.**
>
> Q. Okay. So –

A. And there's – and the other option that comes along probably more so often than that is other tests that might be – that could be done in addition to or tests that could be done otherwise.  So maybe some lower level tests have been skipped over perhaps or something like that.  So we would kind of discuss all of those things in our interactions.

Q. So is it fair to conclude that your interface would be when a physician that is directly managing and taking care of a patient requests that a test be performed, **you intervene in order to determine whether or not an insurance company or an employer healthcare plan is going to actually pay for the test?**

A. **To pay for the test and also to decide if there's another test that might work better.**  And in consultation, oftentimes – because I don't only speak with physicians, I'll also review cases with nurse practitioners – like, what is it, mid level providers, so like nurse practitioners or physician assistants.

Q. **But you never interface directly with the patient, correct?**

A. **Routinely I would never interface with a patient in this particular interaction**, yeah.

(*Id*. PAGEID 1538–39 (16:7–17:24) (emphases added)).  Dr. Hollings estimates that twenty

(20%) percent of her consultations involve obstetrics and gynecology "versus other

subspecialties[.]" (*Id*. PAGEID 1535–36 (13:25–14:10)).  Her work for KEPRO, which she

describes as "intermittent," is "retrospective" review of obstetrics cases involving hospital

admissions "that may potentially reach lawsuit status."  (*Id*. PAGEID 1546–47 (24:18–25:22),

1549 (27:1–10)).

The Hospital makes several arguments as to why Dr. Hollings is not competent to give an

opinion about the standard of care in 1998, including the fact that she did not become board-

certified until 2007.  (Doc. 87 PAGEID 1646).  Dr. Hollings also failed to consult with a

colleague who would have been practicing then as to the standard of care before rendering her

opinion.  (*Id.*; *see* Doc. 86-1, Hollings Dep. PAGEID 1561–63 (39:15–41:21)).  But the Hospital

principally argues that Dr. Hollings is not competent because she does not currently devote at

11

least one-half of her professional time to the active clinical practice in her field of licensure. (Doc. 87 PAGEID 1644–46). The Court agrees.

Dr. Hollings practiced as an OB/GYN from 2006 to 2018. When deposed, she testified that she is not presently practicing obstetrics and has not managed a labor or delivered a baby since "sometime prior to August of 2018[.]" (Doc. 86-1, Hollings Dep. PAGEID 1540–41 (18:13–19:8), 1552 (30:3–6)). The active clinical practice requirement is couched in the present tense ("devotes") and, "[g]enerally, an expert witness in a medical malpractice action must meet the requirements of Evid. R. 601[(B)(5)(b)] at the time the testimony is offered at trial." *Celmer*, 114 Ohio St. 3d at 226, 871 N.E.2d 557, at ¶ 27.

Dr. Hollings's current work for Magellan does not constitute active clinical practice.[7] She does not examine or diagnose patients, order tests, or develop treatment plans. Nor does she supervise physicians who are providing direct patient care. Rather, Dr. Hollings "consults" with medical providers for the purpose of either approving or denying payment for testing that the *providers* recommend. While a financial consideration, the cost of a test—and whether a patient's health insurance will pay for it—is not "adjunctive" to its *therapeutic* value. Thus, Dr. Hollings's work is not an "essential link" in the "chain of services" that constitutes the "comprehensive treatment" of patients. *Goldstein*, 100 Ohio App. 3d at 257, 461 N.E.2d at 1353. And, even if it were, only twenty (20%) percent of her consultations involve obstetrics and gynecology, far below the required "at least one-half" in her "field of licensure."

This is the first case in which Dr. Hollings has offered her opinion as an expert, so she is not a professional witness in the "hired gun" sense. (*See* Doc. 86-1, Hollings Dep. PAGEID

---

[7] Plaintiff does not suggest that Dr. Hollings work for KEPRO qualifies as active clinical practice.

1552 (30:21–31:11)). Although mindful of this purpose behind Ohio Evid. R. 601(B)(5)(b), the Court must base its decision on whether Dr. Hollings actually treats patients at the present time. Because she does not, Dr. Hollings is not competent to testify as an expert in this case. *See Johnson*, 136 N.E.3d 581, at ¶ 18 ("If we thus confined our view to the purpose of Evid. R. 601[(B)(5)(b)], Dr. Walls would seem to pass the test. But this is where the purpose collides with the language. Even though it would be consistent with the purpose of the rule to allow Dr. Walls to testify, we cannot disregard the requirements embodied in its language. As we describe below, the 'administrative' work performed by Dr. Walls does not satisfy the 'active clinical practice' requirement.").

Plaintiff alternately contends that Dr. Hollings' prior years of practice satisfy the active clinical practice requirement. The Court finds otherwise.

In *Celmer*, the Ohio Supreme Court found an exception to the general rule that an expert must satisfy the active clinical practice requirement at the time she renders her opinion. The expert radiologist there satisfied the requirement at the time the alleged malpractice occurred and would have satisfied the requirement if the case had been tried when originally scheduled. *Celmer*, 871 N.E.2d 557, at ¶¶ 7–9. He did not, however, after two years of postponements. *Id*. Given these "specific" facts, "where the witness would have qualified as an expert but for defense continuances and a stay of proceedings resulting from the insolvency of a defendant's [insurance] carrier[,]" it was not an abuse of discretion for the trial court to find that the witness was competent to testify. *Id*. at ¶¶ 25–27. The facts here, though, are markedly different. Dr. Hollings did not begin medical school until *after* the alleged malpractice occurred and she disengaged from active clinical practice *before* Plaintiff filed suit in the Southern District of

Ohio.  (*See* Doc. 86-1, Hollings Dep. PAGEID 1553–54 (31:15–32:25)).  Further, no scheduling delays are attributable to the Hospital.

Plaintiff cites three Ohio appellate court decisions to persuade the Court to find an exception to the express language of the rule.  None are apposite.

In *Crosswhite v. Desai*, 64 Ohio App. 3d 170, 580 N.E.2d 1119 (Ohio App. 2d Dist. 1989), the expert, retired after thirty-three (33) years of practice, was not currently involved in the active practice of medicine at the time he rendered his opinion.  The appellate court found that it was an abuse of discretion for the trial judge to exclude his testimony.  "Retirement from medical practice, standing alone, has not been considered an impediment to competence." *Id*. at 178, 580 N.E.2d at 1124.  Also persuasive were the facts that the expert had practiced in the same geographical area as the defendant physician *and* had observed and treated the plaintiff after the alleged malpractice occurred.  *Id*. at 179, 580 N.E.2d at 1125.  Finally, the expert testified, "I do not testify on behalf of parties to medical malpractice lawsuits unless I have been involved directly as a physician who has examined or treated a patient making a claim.  In other words, my services as a witness are not offered, for hire, as an expert." *Id*. at 173, 580 N.E.2d at 1121.  Dr. Hollings, in contrast, is not retired from a lengthy obstetrics practice.  Instead, after a dozen years of practice,[8] she is in the midst of what might best be described as a sabbatical from clinical work.  (*See* Doc. 86-1, Hollings Dep. PAGEID 1611–12 (89:14–90:14)).  And she has never met, much less observed and treated, Plaintiff.  (*Id*. PAGEID 1594 (72:6–7)).

Relying on *Crosswhite*, the appellate court in *Aldridge v. Garner* found "in this instance, the trial court's strict interpretation of the present-tense requirement contained in [Ohio Evid. R.

---

[8] Dr. Hollings testified, "I've been in obstetrics and gynecology for a little minute[.]"  (Doc. 86-1, Hollings Dep. PAGEID 1611 (89:14–20)).

14

601(B)(5)(b) was] unreasonable." 159 Ohio App. 3d 688, 695, 2005-Ohio-829, 825 N.E.2d 201, at ¶ 18 (Ohio App. 4th Dist. 2005). Aldridge argued the same two theories that Plaintiff does here. Her expert "ended a 20-year career of full-time clinical practice" approximately three years before his deposition. 825 N.E.2d 201, at ¶ 4. At the time of his testimony, he spent eighty (80%) percent of his time working for two insurance companies, which required him "to review casework, talk to doctors about cases, and discuss those cases with medical insureds to determine whether the insurance companies will pay or deny claims for individual patients." *Id*. But, like Dr. Hollings, he "d[i]d not personally examine, diagnose, or treat patients as part of the 80 percent of his professional time that he spends working for insurance companies." 825 N.E.2d 201, at ¶ 15. Based on *McCrory* and *Goldstein*, the appellate court declined to find that his work was "so adjunctive to patient care as to render his current practice within the realm of 'active clinical practice' as intended by the rule." *Id*. But the appellate court was persuaded by the expert's "20-plus years of full-time clinical practice" along with the fact that the expert "was engaged in full-time clinical practice during the time of Garner's alleged malpractice." 825 N.E.2d 201, at ¶ 16. Dr. Hollings's experience falls far short of the "20-plus years" mark, plus, as already noted, she was not engaged in active clinical practice in 1998.

*Hurst v. Poelstra*, No. 94-CA-61, 1995 WL 765968 (Ohio App. 2d Dist. Dec. 22, 1995) is similarly distinguishable. Relying also on *Crosswhite*, the appellate court found no error in the trial court's decision to allow a "semi-retired" neurologist and neurosurgeon—who devoted one partial-day per week—to testify as an expert. The expert satisfied the "letter of the competency requirements" set forth in Ohio Evid. R. 601(B)(5)(b) "because he spent one hundred percent of his professional time, albeit only three hours per week, in an active clinical practice of neurology." *Id*. at *8. Further, his career "spanned a period of thirty years." *Id*.

15

Having determined that Dr. Hollings is not competent to testify as an expert under Ohio substantive law, the Court need not decide whether her opinion as to the standard of care is given with a reasonable degree of scientific certainty. Nor is a *Daubert* analysis necessary. The Hospital's Rule 56(c)(2) objection to her testimony is **SUSTAINED**. Plaintiff may not offer Dr. Hollings's deposition testimony or expert report in opposition to the Hospital's summary judgment motion.

**Dr. Katz is not qualified to testify under Fed. R. Evid. 702.** Michael D. Katz, M.D. is a pediatric neurologist. (Doc. 76-2, Katz Dep. PAGEID 1401–02 (9:8–10:1)). His opinions are limited to causation. (*Id*. PAGEID 1402 (11:6–7), 1403 (14:1–16:8), 1407 (30:14–31:2); Doc. 77-1 PAGEID 1463). The Hospital does not challenge Dr. Katz's competency under Ohio Evid. R. 601(B)(5)(b), but instead disputes his qualification to testify as an expert under Fed. R. Evid. 702.

Dr. Katz was deposed in the state court litigation on March 12, 2018. (Doc. 76-2). At that time, he testified that "most of the children that have PVL have it before 33 weeks' gestation." (*Id*. PAGEID 1409 (39:16–17)). PVL is also seen in mature (or full-term) infants with ischemic cardiac injuries. (*Id*. PAGEID 1409 (39:7–24)). Despite Plaintiff's mother's testimony that her son was born at 38 weeks,[9] Dr. Katz questioned whether Plaintiff may have been "more premature than we know." (*Id*. PAGEID 1409 (39:24–40:10) ("[W]hat I do know is exactly what you said, that this is classically a disorder seen with – or seen in a much higher incidence of children in – who are premature. And that leads us to the question: Was this child born more premature than we know of?")). But he conceded—in the absence of medical records

---

[9] (*See* Doc. 85-1, White Dep. PAGEID 1494 (25:13–19) ("Probably maybe 38 weeks, 39 weeks. I was really close.")).

to review—that he had no opinion as to whether labor and delivery had "any relationship" to

Plaintiff's PVL:

> Q. **That's the reason why you don't have an opinion on whether or not there was any relationship to anything that happened during labor and delivery, because you don't have the medical record; correct?**
>
> A. **I – I could not agree with you more.**
>
> Q. Okay.
>
> A. **I could not agree with you more, but what I – as I said, what I – what I'm working with is working backwards.**
>
> Q. Right.  And you're working backwards to a dry hole, so to speak, there's nothing there to get to –
>
> A. Well –
>
> Q. – correct?
>
> A. Well, that's one **possibility**.  And the other **possibility** is that there is a lot of "there" there.
>
> Q. And the other possibility is this baby had an infection, right –
>
> A. Yeah, that's –
>
> Q.  – at 33 weeks?
>
> A. That's absolutely a part of the differential PVL at this age.  You're absolutely right.
>
> Q. And you're –
>
> A. Well, actually, not just that, it's also part of a due diligence of PVL in a mature child as well.
>
> Q. You wouldn't blame anybody for an infection, would you, not even the mother?
>
> A. Look, I didn't read anyplace that the child had any sort of antibiotics.
>
> Q. That wasn't my question.
>
> A. What?
>
> Q. My question was:  You wouldn't blame anyone for an infection, would you, not even the mother?  **An intrauterine chorioamniotic infection, you wouldn't blame anybody for that, would you?**
>
> A. **No.**

(*Id*. PAGEID 1410 (42:4–43:17) (emphases added)).

The Court agrees with the Hospital that Dr. Katz's March 2018 opinion is speculative and therefore unreliable. His "working backwards" conjecture that Plaintiff was premature rather than full-term finds no support in the record.

> Q. . . . Is it your understanding that this child was born at 38 weeks?
>
> A. No, that's not my understanding.
>
> Q. What is your understanding?
>
> A. **My understanding is I don't know.**
>
> Q. You didn't read the deposition?
>
> A. I read what Mom said, but what I'm saying is is that **if she got the dates wrong**, okay, an exam would have been done at the hospital and **the examiners would have been able to tell how many weeks gestation this child was**. **That doesn't exist** and that's a problem we have.

(*Id*. PAGEID 1409–10 (40:15–41:1) (emphases added)). And his testimony was riddled with *possibilities* rather than probabilities because he had no medical records to review. "The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 529–30 (6th Cir. 2008). The *Daubert* factors incorporated into Rule 702 require this Court to exclude Dr. Katz's March 2018 opinion, as it is based on *in*sufficient facts.

Dr. Katz's June 3, 2020 unsworn letter opinion is also compromised. He writes:

> I have reviewed the available medical records of Jahmir Frank.
>
> I have also reviewed the following documents, material and medical records concerning Jahmir Frank: medical records from Child Care Consultants, Family Health Center, Dr. Tsao's clinic notes, Nationwide Children's Hospital, and Diley Ridge Medical Center. I have reviewed the depositions of Dionne White, Jahmir Frank, Mark Frank, Denise Crawford, the birth photos and the birth video provided by Dionne White.

18

I have also reviewed Affidavits provided by Alan Bedrick, M.D., Elias Chalhub, M.D., and Henry Franklin Farb, M.D.  **I have reviewed the Opinion of D[r]. Jennifer Hollings.**

**Based on my review of the materials in this case, in particular Dr. Hollings' Opinion, infection was a factor in the delivery of Jahmir Frank, specifically chorioamnionitis.**

. . . . It is my further opinion that Jahmir suffers from PVL caused by an intrauterine infection that was present at the time of his birth on July 30, 1998.  My opinions are limited to causation, not violation of any standard of care during Jahmir's delivery.  **Having said that, it is my opinion that Jahmir suffers currently from periventricular leukomalacia caused by an infection during labor and delivery.**

(Doc. 77-1 PAGEID 1462–63 (emphases added)).  Because he relies "particularly" on Dr. Hollings for his opinion on causation, and because the Court has found Dr. Hollings to be incompetent to testify as an expert witness, Dr. Katz's opinion is not "the product of reliable principles and methods[.]"  Fed. R. Evid. 702(c).  It, too, must be excluded.

## B.  DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**Summary judgment standard.**  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A court must view the evidence and draw all reasonable inferences in favor of the nonmoving party.  *See Matsushita Elec.  Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The moving party bears the initial burden of showing the absence of a genuine issue of material fact, but then the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Matsushita*, 475 U.S. at 587.  However, the nonmoving party may not rest on the mere allegations in the pleadings.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324.  The substantive law of the case determines what facts are material and whether a higher burden

of proof is required for a particular element. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

Although a grant of summary judgment is not a substitute for trial, it is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact[.]" *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see LaPointe v. United Autoworkers Loc. 600*, 8 F.3d 376, 378 (6th Cir. 1993).

**The Hospital is entitled to judgment as a matter of law**.  Under Ohio law, a medical malpractice claim must satisfy four elements.  A plaintiff must prove 1) the existence of a duty owed by defendant to plaintiff; 2) a breach of duty by defendant; 3) causation based on probability; and 4) damages. *Galloway v. Fed. Tort Claims Act*, No. 4:17-CV-1314, 2019 WL 3500935, at *3 (N.D. Ohio July 31, 2019) (quoting *Loudin v. Radiology & Imaging Servs., Inc.*, 185 Ohio App. 3d 438, 447, 2009-Ohio-6947, 924 N.E. 2d 433, at ¶ 45 (Ohio App. 9th Dist. 2009) (citing *Stinson v. England*, 69 Ohio St. 3d 451, 455, 1994-Ohio-35, 633 N.E.2d 532 (Ohio 1994))).  The Hospital moves for summary judgment on Plaintiff's medical malpractice claim, arguing that Plaintiff cannot satisfy the second and third elements.

A plaintiff must prove, by a preponderance of the evidence, that his injury "was caused by the doing of some particular thing or things **that a physician or surgeon of ordinary skill, care and diligence would not have done** under like or similar conditions or circumstances, **or by the failure or omission** to do some particular thing or things that **such a physician or surgeon would have done**[.]" *Bruni v. Tatsumi*, 46 Ohio St. 2d 127, 131, 346 N.E.2d 673, 677

20

(Ohio 1976) (emphases added). "Proof of the recognized standards must necessarily be provided through expert testimony." *Id.* at 131–32, 346 N.E.2d at 677. A plaintiff must also "prove causation through medical expert testimony in terms of probability to establish that the injury was, more likely than not, caused by the defendant's negligence." *Davis v. United States*, 302 F. Supp. 3d 951, 957 (S.D. Ohio 2017) (quoting *Roberts v. Ohio Permanente Med. Grp., Inc.*, 76 Ohio St. 3d 483, 485, 1996-Ohio-375, 668 N.E.2d 480, 482 (Ohio 1996)).

As previously discussed, at various points in the state court litigation and here in the Southern District of Ohio, Plaintiff offered the May 17, 2018 expert testimony of Dr. Parker for the proposition that it was "not possible" to render a standard of care opinion. (*See, e.g.*, Doc. 61-7, Parker Aff. PAGEID 1057 (¶ 1), 1058 (¶ 7)). The Court has since determined that Plaintiff's second standard of care witness, Dr. Hollings, is incompetent to testify under Ohio substantive law. Thus, the only standard of care evidence properly before the Court is the expert testimony of Harry Franklin Farb, M.D., an obstetrician who also practices in the subspecialty of maternal-fetal medicine. (*See* Doc. 71-1 & PAGEID 1354 (¶ 1)).[10] The Hospital's expert Dr. Farb opines, "based upon a reasonable degree of medical certainty, that in spite of the fact there are no medical records associated with this delivery, based upon the birth video and the birth photos, **there is no reason to suspect that a deviation from the standard of care occurred in this case**." (*Id.* PAGEID 1355 (¶ 7) (emphasis added); *see id.* PAGEID 1356 (¶ 12)).

The Court also has determined that Plaintiff's causation witness, Dr. Katz, is not qualified to testify under the federal rules of evidence. As to causation, the Hospital's expert Dr. Farb further opines, "based upon a reasonable degree of medical certainty that Jahmir Frank's brain

---

[10] Reviewing Dr. Farb's affidavit, the Court finds that he is competent to testify under Ohio substantive law and qualified to testify under Fed. R. Evid. 702. Plaintiff does not challenge Dr. Farb's competency or qualification.

injury is completely unrelated to the provision of medical/obstetric/nursing services provided at the time of labor and delivery." (*Id*. PAGEID 1356 (¶ 11); *see id*. (¶ 12)). Other causation evidence properly before the Court is the expert testimony of Alan Bedrick, M.D., a neonatologist. (*See* Doc. 69-1 & PAGEID 1345 (¶ 1)).[11] Based on the birth photographs, the Hospital's expert Dr. Bedrick concludes "there is no evidence of neonatal encephalopathy at the time of delivery and the photographs are consistent with the mother's description of an uncomplicated delivery and post-natal course." (*Id*. PAGEID 1345 (¶ 7)). He thereafter opines, "[i]t is my opinion based upon a reasonable degree of medical certainty, that Jahmir Frank's brain injury is completely unrelated to the provision of medical and/or nursing services provided at the time of labor and delivery. This brain injury was associated with the loss of periventricular white matter, which occurred in the late second trimester or early third trimester, which was not proximately caused by the medical/hospital team involved in this delivery." (*Id*. (¶¶ 9, 10)). Additional causation evidence properly before the Court is the expert testimony of Elias Chalhub, M.D., who is board-certified in neurology with a special certification in pediatric neurology. (*See* Doc. 70-1 & PAGEID 1349 (¶ 3)).[12] The Hospital's expert Dr. Chalhub opines, "based on a reasonable degree of medical certainty/probability, that Jahmir Frank's brain injury is completely unrelated to the medical and nursing care rendered at the time the (sic) the labor and delivery . . . . Rather, this brain injury was associated with a loss of periventricular white

---

[11] Reviewing Dr. Bedrick's affidavit, the Court finds that he is competent to testify under Ohio substantive law and qualified to testify under Fed. R. Evid. 702. Plaintiff does not challenge Dr. Bedrick's competency or qualification.

[12] Reviewing Dr. Chalhub's affidavit, the Court finds that he is competent to testify under Ohio substantive law and qualified to testify under Fed. R. Evid. 702. Plaintiff does not challenge Dr. Chalhub's competency or qualification.

matter which likely occurred in the late second trimester or early third trimester of that pregnancy." (*Id*. PAGEID 1350–51 (¶¶ 9, 10)).

Because Plaintiff has not produced a competent expert who will offer an admissible opinion at trial that the Hospital breached the applicable standard of care during Plaintiff's delivery—rendering unopposed Dr. Farb's opinion that the standard of care was *not* breached—there is no genuine dispute as to the second element that Plaintiff is required to prove. And because Plaintiff has not produced a competent expert who will offer an admissible opinion at trial that any alleged deviation from the standard of care actually caused Plaintiff's brain injury—rendering unopposed the opinions of Drs. Farb, Bedrick, and Chalhub that Plaintiff's brain injury is *unrelated* to his delivery—there is no genuine dispute as to the third element that Plaintiff is required to prove. Accordingly, the Hospital is entitled to judgment as a matter of law as to Plaintiff's medical malpractice claim.

## III.     CONCLUSION

To summarize, the Court construes Defendant's Motion to Strike Dr. Jennifer Jones Hollings and Dr. Michael Katz as Plaintiff's Expert Witnesses (Doc. 87) as objections to Plaintiff's evidence under Fed. R. Civ. P. 56(c)(2) and those objections are **SUSTAINED**. Defendant's Motion for Summary Judgment (Doc. 88) is therefore **GRANTED**. The Clerk shall terminate this civil action from the docket of the Court.

        **IT IS SO ORDERED.**                          /s/ *Michael R. Barrett*
                                                                  Michael R. Barrett, Judge
                                                                  United States District Court